**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

TINA GUNALDO                                          CIVIL ACTION

VERSUS                                                          No. 20-154

BOARD OF SUPERVISORS OF LOUISIANA          SECTION I
STATE UNIVERSITY AND AGRICULTURAL
AND MECHANICAL COLLEGE, ET AL.

**ORDER & REASONS**

Before the Court is defendants Board of Supervisors of Louisiana State University and Agricultural and Mechanical College ("LSU"), Dr. Joseph M. Moerschbaecher ("Moerschbaecher"), Larry Hollier ("Hollier"), and Rosalynn Martin's ("Martin") (collectively, the "defendants") motion[1] to dismiss plaintiff Tina Gunaldo's ("Gunaldo") first amended complaint[2] pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. For the following reasons, the motion is granted in part and denied in part.

**I.**

This case arises from Gunaldo's claims against the defendants for alleged violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et. seq.* ("Title VII") and the Equal Pay Act, 29 U.S.C. § 201 *et seq.* (the "EPA").[3]

---

[1] R. Doc. No. 21.
[2] R. Doc. No. 15.
[3] *See* R. Doc. No. 15, at 1–16.  Pursuant to the discussion at the status conference on July 7, 2020, counsel for Gunaldo notified the Court that Gunaldo did not intend to proceed with her claim asserted under 42 U.S.C. § 1983. *See* R. Doc. No. 31.

## A.

Accepting all of the factual assertions in Gunaldo's complaint as true, the relevant allegations are as follows: Gunaldo began working for Louisiana State University Health – New Orleans ("LSUHNO"), an LSU institution, as Director of the Center for Interprofessional Education and Collaborative Practice ("CIPECP") in April 2015.[4]  At that time, the salary range for position of Director of the CIPECP was $115,153.00 to $213,032.00.[5]  Gunaldo started her position as a 0.50 full-time equivalent ("FTE") employee with an annual salary of $60,000.00.[6]  Gunaldo eventually transitioned to 1 FTE on December 1, 2016, with a salary of $120,000.00.[7] Gunaldo's position falls within the purview of the Chancellor's office.[8]

In the beginning of 2017, Gunaldo met with Moerschbaecher, Vice Chancellor of Academic Affairs, to discuss annual raises within the institution.[9]  Moerschbaecher informed Gunaldo that due to a state salary freeze, LSUHNO was considering giving employees "equity raises" in order to elevate their salaries to the appropriate salary ranges.[10]  Gunaldo subsequently received a two-percent raise, amounting to an annual salary of $122,400.00.[11]  Gunaldo inquired as to why her salary increase was

---

Accordingly, the Court will disregard those portions of the parties' briefs addressing the § 1983 claim.

[4] R. Doc. No. 15, at 1–2 ¶¶ 2–3, 5 ¶ 29.

[5] *Id.* at 5 ¶ 29.

[6] *Id.* at 5 ¶ 30.

[7] *Id.* at 5 ¶ 31.

[8] *See id.* at 6 ¶¶ 42–43.

[9] *Id.* at 5 ¶ 32.

[10] *Id.* at 5 ¶ 33.

[11] *Id.* at 5 ¶ 34.

just two percent, knowing that salary adjustments varied and that some of her male counterparts had received salary increases in excess of fifteen percent.[12] Moerschbaecher informed Gunaldo that he would communicate with the Human Resources ("HR") department regarding the decision to raise her salary by two percent.[13]

In March of 2018, Moerschbaecher informed Gunaldo that HR was responsible for deciding the percentage of employees' salary increases.[14]  Gunaldo met with Martin, the Director of HR, who informed her of a study that LSUHNO had conducted to assess the equity of its salary structure.[15] Martin provided Gunaldo with a list of comparison institutions and a document that equated the Director of the CIPECP position to an Associate/Assistant Dean of Continuing Education in a School of Medicine.[16]   Martin also informed Gunaldo that, contrary to Moerschbaecher's representation, administrators and each dean determined the level of salary raises.[17]

Gunaldo alleges that the study referenced by Martin actually revealed wage disparities between male and female employees at the same paygrade within the Chancellor's office.[18]   Five employees, two male employees and three female employees, including Gunaldo, worked within the Chancellor's office and were placed

---

[12] *Id.* at 5 ¶ 35.
[13] *Id.* at 5 ¶ 36.
[14] *Id.* at 7 ¶ 47.
[15] *Id.* at 5 ¶ 37, 7 ¶ 48.
[16] *Id.* at 7 ¶ 49.
[17] *Id.* at 7 ¶ 50.
[18] *Id.* at 6 ¶ 39.

within the N37 paygrade.[19]  According to the study, the three women, with salaries of $115,839.00, $127,500.00, and $120,000.00,[20] were paid well below the $162,242 midpoint salary for the N37 paygrade.[21]  The salaries of the male employees within the N37 paygrade—$167,757.96 and $180,743.04—exceeded the midpoint salary for that paygrade.[22]

Despite the results of the study, LSU and Hollier, Chancellor of LSUHNO, took no action to correct the disparities, and they in fact increased the salaries of male employees.[23]  For example, after the results of the study were provided to female employees, LSUHNO's then-general counsel learned that Hollier intended to increase her salary, but only to a level that still fell below the minimum salary for the relevant paygrade.[24]

On November 26, 2018 Gunaldo met with Moerschbaecher to inform him that her meeting with Martin did not clarify her pay rate.[25]  Gunaldo communicated her intention to compare public records for LSUHNO salaries and to initiate the process to claim gender discrimination.[26]  On that same day, Gunaldo sent an email to LSUHNO alleging gender discrimination as related to her salary and completed an online report with the Louisiana Commission on Human Rights ("LCHR").[27]  Martin

---

[19] *Id*. at 6 ¶ 42.
[20] As previously mentioned, Gunaldo's salary was $120,000. *Id*. at 5 ¶ 31, 6 ¶ 43.
[21] *Id*. at 6 ¶ 43.
[22] *Id*. at 6 ¶ 44.
[23] *Id*. at 2 ¶ 7, 6 ¶ 40.
[24] *Id*. at 6 ¶ 41.
[25] *Id*. at 7 ¶ 51.
[26] *Id*. at 7–8 ¶ 52.
[27] *Id*. at 8 ¶ 54.

responded to Gunaldo's email later that same day and informed her that the HR Employee Relations Team ("ERT") would be contacting her.[28]

On December 3, 2018, Gunaldo met with Terrilyn Cunningham and Jason Johnson of the ERT.[29]  Gunaldo informed them of the reports she received from the Louisiana Civil Service Commission with respect to LSUHNO salaries dating back to 2012 and the conclusions she was able to draw from the reports.[30]  Specifically, Gunaldo was able to conclude that the annual average salary for male employees within "central administration" from February 28, 2017 to December 31, 2018 was significantly higher than that for female employees, and that the average salary increase for male employees in 2017 and 2018 was higher than the average salary increase for female employees during the same time period.[31]  Gunaldo was also able to conclude that, in 2017, the male directors of academic affairs received an average salary increase of fourteen percent while female directors of academic affairs received just a ten percent increase.[32]

According to Gunaldo, the reports also revealed that the average salary of male employees employed in Director of Academic Affairs positions, including those employed within central administration and at individual schools, was significantly higher than that for female employees in the same positions.[33]  For example, in 2017,

---

[28] *Id.* at 8 ¶ 55.
[29] *Id.* at 8 ¶ 56.
[30] *Id.* at 8 ¶ 57.
[31] *Id.* at 8–9 ¶¶ 57–59.
[32] *Id.* at 9 ¶ 60.
[33] *Id.* at 9 ¶ 61.

male employees holding Director of Academic Affairs positions received an average salary increase of five percent, whereas female employees in the same positions received an increase of only four percent.[34]   Likewise, in 2018, male employees in these positions received an average salary increase of one percent, whereas female employees in the same positions received, on average, no salary increase.[35]

Finally, Gunaldo was able to conclude from the reports that, beginning in 2015, the year she began her employment with LSU, the average annual salary for a director or dean position was: $128,794.00; $123,918.00; $135,965.00; and $142,711.00, respectively.[36]   Gunaldo's annual salary has been well below the average salary for a director or dean every year she has been employed by LSUHNO.[37]

Gunaldo informed the ERT that they had access to the same information on which she based her conclusions and that she would keep them updated as to the status of her claim with the LCHR.[38]   Gunaldo also mentioned three topics during the meeting, unrelated to gender discrimination, that she thought would be beneficial for any person who assumed the Director of CIPECP position in the future: (1) the Director of CIPECP does not have a dedicated parking spot, whereas other directors within the institution have the benefit of a reserved parking spot; (2) the current job description was outdated, as it did not include development of curriculum, teaching,

---

[34] *Id.* at 9 ¶ 62.
[35] *Id.*
[36] *Id.* at 9 ¶ 63.
[37] *Id.*
[38] *Id.* at 9 ¶ 64.

and grading; and (3) the Director of CIPECP did not hold a faculty position.[39] Gunaldo addressed these issues because she felt that if administrators wanted her to engage in faculty activities, this should be a part of her job description and a faculty position could be warranted.[40]  The general practice at LSUHNO is for each employee to write their own job description, so the job descriptions of LSUHNO employees are not uniform.[41]

At the conclusion of the meeting, the ERT informed Gunaldo that they would need time to review her allegations and to discuss the other topics she raised related to the Director of the CIPECP position.[42]  The ERT indicated that they would likely not have an update until after the holidays.[43]

On December 3, 2018, Gunaldo sent an email to the ERT with written comments related to her current job description.[44]

Gunaldo officially filed a charge of discrimination with the LCHR on December 28, 2018.[45]

On February 19, 2019, Gunaldo met with the ERT for the second time.[46]  The ERT gave Gunaldo a letter, which stated that her equal pay allegations were unsubstantiated and that the ERT could not provide reasons as to how it arrived at

---

[39] *Id.* at 9–10 ¶ 65.
[40] *Id.* at 10 ¶ 66.
[41] *Id.* at 12 ¶ 81.
[42] *Id.* at 10 ¶ 67.
[43] *Id.*
[44] *Id.* at 10 ¶ 68.
[45] *Id.* at 11 ¶ 76.
[46] *Id.* at 10 ¶ 69.

this conclusion.[47]  The letter also stated that "the findings and recommendations have been reported to the Chancellor."[48]

Gunaldo inquired as to what positions were used for salary comparisons, and the ERT stated that it was unable to provide that information.[49]  However, Gunaldo was informed that based upon a review of the Director of the CIPECP job description and the revisions she suggested, she would receive a ten percent salary increase on or about March 1, 2019.[50]  When asked about the justification for the ten percent increase, the ERT responded that no specifics could be provided.[51]

On February 27, 2019, Martin along with the HR compensation manager and another representative from HR met with Gunaldo regarding the calculation of her salary adjustment.[52]  During this meeting, Gunaldo was provided with the following information: comparative data from the University of North Texas Health Sciences Center and the University of Tennessee; the salary range for the N37 paygrade within LSUHNO ($119,736.00–$204,748.00), which had changed since the time of Gunaldo's hiring; a suggested revised position description based on Gunaldo's recommendations during her meetings with the ERT; and a position title change for Gunaldo for future salary comparisons beginning in 2019 (Chief Academic Assessment Officer).[53]

---

[47] *Id.*
[48] *Id.* at 10 ¶ 71.
[49] *Id.* at 10 ¶ 70.
[50] *Id.* at 10 ¶ 72.
[51] *Id.*
[52] *Id.* at 11 ¶ 73.
[53] *Id.* at 11 ¶ 74.

Gunaldo was also informed during the meeting that the purpose of the 2017 salary adjustments was to raise employee salaries to the minimum of employees' respective salary ranges.[54]  However, the institution only had $5 million to distribute and needed $18 million to raise all employee salaries to meet the appropriate threshold.[55]

Gunaldo sent Moerschbaecher and Martin an email on March 1, 2019 suggesting revisions to the proposed job description.[56]

On or about October 1, 2019, Gunaldo received a university-wide three percent cost of living adjustment, which increased her annual salary to $138,678.96.[57] However, her salary is still less than her male counterparts despite the increase.[58]

On or about October 21, 2019, Gunaldo received a right to sue notice from the LCHR.[59]  Gunaldo initiated suit on January 15, 2020.[60]

### B.

As the Director of the CIPECP, Gunaldo provides leadership and direction to faculty, staff, and students to facilitate planning, development, coordination, implementation, and evaluation of interprofessional education and collaborative practice initiatives, and she acts as a liaison between her office and outside entities.[61]

---

[54] *Id.* at 11 ¶ 74(e).
[55] *Id.*
[56] *Id.* at 11 ¶ 75.
[57] *Id.* at 11 ¶ 78.
[58] *Id.* at 12 ¶ 79.
[59] *Id.* at 11 ¶ 77.
[60] *See* R. Doc. No. 1.
[61] R. Doc. No. 15, at 12 ¶ 80, 13 ¶ 93.

Gunaldo has a research doctorate degree, a clinical doctorate degree, a master's degree, and a bachelor's degree.[62]   Gunaldo supervises one full-time employee and one student worker.[63]

Gunaldo offers five male comparators that allegedly perform substantially equal work whose job duties are similar to hers.[64]   The amended complaint further alleges that the comparators' positions require equal skill and effort and offer the same responsibility under similar working conditions as the Director of the CIPECP position.[65]

Patrick Reed ("Reed"), the Director of Technology Management, works in central administration at the same level as Gunaldo under the Vice Chancellor of Academic Affairs and had an annual salary of $181,716.96 as of December 31, 2019.[66] Like Gunaldo, there are no other employees who share his job title and he supervises one full-time employee.[67]   Reed's job duties and responsibilities include the advancement of innovation, supporting the research enterprise, and partnering with outside individuals and businesses to collaborate on research and to commercialize inventions.[68]   He oversees patents, copyrights, and other intellectual property rights

---

[62] *Id.* at 12 ¶ 83.
[63] *Id.* at 12 ¶ 82.
[64] *See id.* at 12 ¶ 84.
[65] *See id.* at 12 ¶ 85.
[66] *Id.* at 12 ¶ 86.
[67] *Id.* at 12 ¶¶ 86–87.
[68] *Id.* at 13 ¶ 89.

for faculty and students.[69]  Reed has a bachelor's degree, master's degree, and is a

certified Registered Technology Transfer Professional.[70]

Christopher Vidrine ("Vidrine"), the former Director of External Relations,

worked at the same level as Gunaldo in central administration until the end of 2018.[71]

Vidrine's annual salary as of December 31, 2018 was $163,718.04.[72]  Like Gunaldo,

there are no other employees who shared his job title, and he worked as a liaison

between the institution and outside entities.[73]  Specifically, Vidrine's office served as

the liaison between LSUHNO, university administration, the Board of Regents, the

executive and legislative branches of government, and regulatory agencies on the

state and federal level on a wide range of budget matters, policy issues, and universal

concerns that affect higher education and health care.[74]  Vidrine has a bachelor's

degree and a master's degree.[75]

Jawed Alam, the Executive Director of Research Services, works in central

administration at the same level as Gunaldo under the Vice Chancellor of Academic

Affairs.[76]  Alam's salary as of June 2019 was $225,000 and, like Gunaldo, no other

employee shares his job title.[77]  Alam's office is responsible for providing programs

related to grant applications, clinical trial agreements, and registration information

---

[69] *Id.*
[70] *Id.* at 12 ¶ 88.
[71] *Id.* at 13 ¶ 90.
[72] *Id.*
[73] *Id.* at 13 ¶¶ 90, 93.
[74] *Id.* at 13 ¶ 92.
[75] *Id.* at 13 ¶ 91.
[76] *Id.* at 13 ¶ 94.
[77] *Id.* at 13 ¶ 94.

for institutional oversight committees.[78]  Alam supervises nine employees.[79]  Alam has a bachelor's degree, master's degree, and a Ph.D.[80]

Matthew Gedge, the former project manager, reported to the Vice Chancellor of Administration and Finance in central administration and sat at the same level under the Vice Chancellor of Academic Affairs as Gunaldo.[81]  Like Gunaldo, there are no other employees who share Gedge's job title.[82]  Gedge's last known salary was $186,000, and he does not possess a master's or doctorate degree.[83]

Roy Clay ("Clay"), former Fiscal Finance Officer in central administration, also reported to the Chancellor of Administration and Finance in central administration.[84]  Clay's annual salary was $167,757.96 in 2019.[85]  Clay does not have a master's or doctorate degree.[86]

## II.

Pursuant to Rule 12(b)(6), a district court may dismiss a complaint or part of a complaint when a plaintiff fails to set forth well-pleaded factual allegations that "raise a right to relief above the speculative level." *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *Cuvillier v. Taylor*, 503 F.3d 397, 401 (5th Cir. 2007). The complaint "must contain sufficient factual matter, accepted as true, to 'state a claim

---

[78] *Id.* at 14 ¶ 97.
[79] *Id.* at 13 ¶ 95.
[80] *Id.* at 14 ¶ 96.
[81] *Id.* at 14 ¶ 98.
[82] *Id.*
[83] *Id.* at 14 ¶ 99.
[84] *Id.* at 14 ¶ 100.
[85] *Id.* at 14 ¶ 100.
[86] *Id.*

to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 547).

A facially plausible claim is one in which "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* If the well-pleaded factual allegations "do not permit the court to infer more than the mere possibility of misconduct," then "the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief.'" *Id.* at 679 (quoting Fed. R. Civ. P. 8(a)(2)) (alteration in original).

In assessing the complaint, a court must accept all well-pleaded facts as true and liberally construe all factual allegations in the light most favorable to the plaintiff. *Spivey v. Robertson*, 197 F.3d 772, 774 (5th Cir. 1999). Furthermore, "the Court must typically limit itself to the contents of the pleadings, including attachments thereto." *Admins. of the Tulane Educ. Fund v. Biomeasure, Inc.*, 08-5096, 2011 WL 4352299, at *3 (E.D. La. Sept. 6, 2011) (Vance, J.) (citing *Collins v. Morgan Stanley Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000)). "Dismissal is appropriate when the complaint 'on its face show[s] a bar to relief.'" *Cutrer v. McMillan*, 308 F. App'x 819, 820 (5th Cir. 2009) (quoting *Clark v. Amoco Prod. Co.*, 794 F.2d 967, 970 (5th Cir. 1986)).

### III.   Title VII

The amended complaint alleges that LSU intentionally discriminated against Gunaldo, a female, on the basis of her sex in violation of Title VII by compensating

her at a salary lower than similarly situated male employees.[87] Gunaldo asserts this claim only against LSU and not any of the individual defendants.

### A.

LSU argues that the information Gunaldo provides with respect to allegedly similarly situated male employees does not adequately establish that they are sufficient comparators for purposes of Title VII, because Gunaldo fails to allege how these comparators are on the "same playing field" as Gunaldo.[88] LSU highlights that Gunaldo does not state the comparators' respective paygrades, and it argues that there are a number of factors that can explain the alleged pay discrepancies that Gunaldo fails to mention, such as number of years in the position and type of experience in prior employment.[89]

Specifically, LSU maintains that Reed, the Director of Technology Management, does not have substantially equal work and similar job duties as Gunaldo.[90] Reed is responsible for overseeing patents, copyrights, and other intellectual property rights, whereas Gunaldo coordinates and implements interprofessional education.[91] LSU notes that Alam, the Executive Director of Research Services, supervises nine employees, whereas Gunaldo supervises only one full-time employee.[92] Furthermore, LSU argues, Gunaldo fails to provide any factual

---

[87] R. Doc. No. 15, at 14 ¶¶ 102–03.
[88] R. Doc. No. 21-2, at 9–10.
[89] *Id.* at 10.
[90] *Id.*
[91] *Id.*
[92] *Id.*

14

allegations with respect to Gedge's or Clay's skills, efforts, or responsibilities, their respective job duties, the number of employees they oversee, their paygrades, their work experience and history, or the number of years they have been employed with LSUHNO.[93]  LSU argues that because Gunaldo fails to set forth any facts alleging the precise job functions she performed that were equivalent to those performed by her male comparators or explain how she was paid less for the same work, her Title VII claim must be dismissed.[94]

Gunaldo responds that, contrary to LSU's assertions, she has specifically named similarly situated male employees and set forth factual allegations supporting her claim that she was treated differently from these male employees based on her sex.[95]  Gunaldo contends that the information included in her complaint about similarly situated male employees is the only information available to her without additional discovery and that, through discovery, she will be able to gather evidence that proves that the comparators are similarly situated and treated more favorably by LSU.[96]  Because the defendants have not answered her original or amended complaint, Gunaldo argues that whether the alleged comparators are similarly situated is a question of fact that is not determinable at this stage of litigation.[97]

---

[93] *Id.* at 10–11.
[94] *Id.* at 11.
[95] R. Doc. No. 24, at 12.
[96] *Id.*
[97] *Id.*

**B.**

Title VII makes it unlawful for an employer to discriminate against any individual with respect to her compensation, terms, conditions, or privileges of employment on the basis of sex, among other things. 42 U.S.C. § 2000e-2(a)(1). Accordingly, the relevant inquiry is whether LSU intentionally discriminated against Gunaldo based on her sex. *See Niwayama v. Texas Tech Univ.*, 590 F. App'x 351, 357 (5th Cir. 2014) (citing *Roberson v. Alltel Info. Servs.*, 373 F.3d 647, 651 (5th Cir. 2004)).

An intentional discrimination claim can be established by either direct or circumstantial evidence. *Id.* When analyzing a discrimination claim based on circumstantial evidence, the Fifth Circuit applies the *McDonnell Douglas* burden-shifting framework. *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 522 (5th Cir. 2008) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)). To make out a prima facie case of discrimination in compensation, a plaintiff must show that she was (1) a member of a protected class, who was (2) paid less than a non-member, for (3) work requiring substantially the same responsibility. *Id.* (citation omitted). If the plaintiff succeeds in establishing her prima facie case, the burden shifts to the defendant to identify a non-discriminatory justification for the pay disparity. *Id.* If the employer does articulate a valid justification, the burden then shifts back to the plaintiff to demonstrate a fact issue as to whether the employer's proffered reason is pretextual. *Id.*

Importantly, the Supreme Court has distinguished the *McDonnell Douglas* evidentiary standard from pleading requirements.  *See Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510–11 (2002).  Accordingly, "a plaintiff need not make out a prima facie case of discrimination [under *McDonnell Douglas*] in order to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim," *Raj v. La. State Univ.*, 714 F.3d 322, 331 (5th Cir. 2013), and a district court errs "by subjecting a plaintiff's allegations to a rigorous factual or evidentiary analysis under the *McDonnell Douglas* framework[.]"  *Cicalese v. Univ. of Texas Med. Branch*, 924 F.3d 762, 767 (5th Cir. 2019) (citation omitted).

A plaintiff must still, however, "plead sufficient facts on all of the ultimate elements of a disparate treatment claim to make h[er] case plausible."  *Chhim v. Univ. of Texas at Austin*, 836 F.3d 467, 470–71 (5th Cir. 2016) (citations omitted).  These "ultimate elements" are: "(1) an 'adverse employment action,' (2) taken against a plaintiff '*because of* her protected status.'"  *Cicalese*, 924 F.3d at 767.  Although a plaintiff need not satisfy the *McDonnell Douglas* framework in order to state a claim for relief under Title VII, "allegations related to that prima facie inquiry may nonetheless be helpful in satisfying the general *Iqbal* plausibility standard."  *Haskett v. Continental Land Resources, L.L.C.*, 668 F. App'x 133, 134 (5th Cir. 2016).

Because LSU only attacks the final element of Gunaldo's prima facie case, the Court will reference the *McDonnell Douglas* framework in analyzing whether the amended complaint states a plausible claim for relief.  To establish the final prong of a discriminatory compensation prima facie claim, a plaintiff will ultimately have to

show that her "circumstances are 'nearly identical' to those of a better-paid employee who is not a member of the protected class." *Taylor,* 554 F.3d at 523 (citation omitted).  To make this showing, a plaintiff's work must require "substantially the same responsibility" as that of the proffered comparator.  *Herster v. Bd. of Supervisors of Louisiana State Univ.*, 887 F.3d 177, 184 (5th Cir. 2018).  A variety of factors are considered, including job responsibilities, experience, and qualifications. *Id.* at 185. "By properly showing a significant difference in job responsibilities, [a defendant] can negate one of the crucial elements in [a plaintiff's] prima facie case of discrimination." *Id.* (internal quotation marks and citations omitted).

A plaintiff need not, however, make this "nearly identical" showing at the pleading stage. *See Cicalese*, 924 F.3d at 767–68.  In *Cicalese*, the Fifth Circuit reversed the dismissal of a Title VII discrimination claim when the district court faulted the plaintiffs' complaint for failing to sufficiently allege how the plaintiffs' co-workers "were treated differently under *nearly identical* circumstances." *Id.* at 767. The Fifth Circuit held that the district court's analysis—"scrutinizing whether [the plaintiffs'] fellow employees were really 'similarly situated'"—was more suited to the summary judgment phase.  *Id.* at 768. The court reiterated that, at the pleading stage, "a plaintiff need only plausibly allege facts going to the ultimate elements of the claim to survive a motion to dismiss." *Id.*

LSU seeks to have the Court impose a higher legal standard on Gunaldo than required at the pleading stage—namely, that the complaint assert "the precise job functions [Gunaldo] performed that were equivalent to those performed by her male

comparators" and exactly "how she was paid less for the same work."[98] As the Fifth Circuit explained in *Cicalese,* Gunaldo does not have to specifically allege how the male comparators "were treated differently under *nearly identical* circumstances" in order to survive a motion to dismiss. 924 F.3d at 767. Rather, the relevant inquiry is whether Gunaldo has pled sufficient facts to make a plausible case that LSU compensated her less than her male counterparts because of her sex. *See id.* The Court finds that Gunaldo has "surmounted that lower bar." *See id.* at 768.

Specifically, at least three of the comparators worked on the same level in central administration as Gunaldo under the Vice Chancellor of Academic Affairs.[99]

---

[98] The defendants rely on *Corkern v. Stranco Field Servs., LLC*, No. 18-5566, 2018 WL 4614001, at *2 (E.D. La. Sept. 26, 2018) (Wilkinson, M.J.) for this assertion. R. Doc. No. 21-2, at 11; R. Doc. No. 28, at 3. In *Corkern,* the court dismissed the plaintiff's EPA claim because the complaint "fail[ed] to specify the precise job functions she performed that were equivalent to those performed by her male counterparts, and neglect[ed] to articulate how she was paid less for the same work." *Id.* The complaint simply restated an element of a prima facie EPA case and failed to set forth any facts that showed that her male co-workers who received salary increases performed substantially equal work as the plaintiff. *Id.*

Setting aside the fact that *Corkern* addressed only an EPA claim, as discussed, *infra,* the amended complaint in the instant case does more than simply restate an essential element of the prima facie case. Moreover, this Court respectfully disagrees with *Corkern*'s conclusion that the plaintiff was required to specify the precise job functions she performed that were equivalent to those performed by the male comparators to survive a  motion to dismiss. Notably, none of the cases cited by *Corkern* in support of its conclusion were decided at the pleading stage. *See Pearce v. Wichita Cty., City of Wichita Falls, Tex., Hosp. Bd.*, 590 F.2d 128, 133 (5th Cir. 1979) (appeal of judgment entered after trial); *Jones v. Flagship Int'l*, 793 F.2d 714, 723 (5th Cir. 1986) (appeal of judgment entered after trial); *Weaver v. Basic Energy Servs., L.P.*, No. 13-022, 2014 WL 12513180, at *1 (W.D. Tex. Jan. 8, 2014), *aff'd*, 578 F. App'x 449 (5th Cir. 2014) (summary judgment); *Blackburn v. Cypress Equities I, LP*, No. 12-5030, 2014 WL 4771765, at *1 (N.D. Tex. Sept. 25, 2014) (summary judgment).

[99] R. Doc. No. 15, at 12–14 ¶¶ 86, 94, 98. The amended complaint alleges that Vidrine worked at the same level as Gunaldo in central administration. *Id.* at 13 ¶ 90. It is

At least one comparator, like Gunaldo, is responsible for acting as a liaison between his office and outside entities.[100] With respect to experience, qualifications, and skill, the comparators, based on the amended complaint, appear to hold equivalent or inferior educational degrees to Gunaldo.[101] Furthermore, a study conducted by LSUHNO allegedly revealed that Gunaldo was paid substantially less than the two men who also worked in the Chancellor's office at the N37 paygrade.[102]

Moreover, the Court notes that, because LSUHNO permits employees to write their own job descriptions and these descriptions are not uniform, it would be extraordinarily difficult for Gunaldo to plead, without the benefit of the discovery, the particular responsibilities and skills required by her position compared to the responsibilities and skills required by the male comparators' positions.[103] This is especially true in light of the fact that Gunaldo and four of the five comparators are the only employees at LSUHNO with their respective job titles and responsibilities.[104]

---

unclear to the Court whether this also means that Vidrine worked under the Vice Chancellor of Academic Affairs.

[100] *Id*. at 13 ¶ 93.

[101] *Compare id*. at 12 ¶ 83, *with id*. at 12–14 ¶¶ 88, 91, 96, 99, 100.

[102] *Id*. at 6 ¶ 42. The lowest-paid male employee in the Chancellor's office at the N37 paygrade made in excess of $47,000 more than Gunaldo. *See id*. at 6 ¶¶ 43–44.

It does not appear from the face of the complaint that any of the proffered comparators were the men who worked in the Chancellor's office at the N37 paygrade. However, this allegation is still relevant as these two other men may also be comparators.

[103] *See id*. at 12 ¶ 81.

[104] *See id*. at 12–14 ¶¶ 86, 90, 94, 98. The defendants emphasize the fact that the amended complaint fails to include the paygrade of each comparator.  While such information, if available, may have been helpful in analyzing Gunaldo's claims, its absence is certainly not fatal.  Moreover, even if Gunaldo and the comparators are all

Consequently, the Court finds that Gunaldo has stated a claim for relief under Title VII.[105] *See Muslow v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, No. 19-11793, 2020 WL 1864876, at *2–*3, *22 (E.D. La. Apr. 14, 2020) (Ashe, J.) (holding that plaintiffs sufficiently pled that they were treated differently than their male counterparts based on their allegations that the defendants selected "a younger, less-experienced white man" as one plaintiff's replacement and increased the salaries of plaintiffs' male counterparts without increasing plaintiffs' salaries);[106] *Wei-Ping Zeng v. Texas Tech Univ. Health Scis. Ctr. at El Paso*, No. 19-99, 2019 WL 4565101, at *5 (W.D. Tex. July 29, 2019) (denying the defendant's motion to dismiss plaintiff's Title VII disparate treatment claim because the complaint "allege[d] the employees were in a similar position, which is sufficient at the motion to dismiss stage because a close factual analysis of whether [plaintiff's] fellow employees were sufficiently similar is more appropriate for resolution on summary judgment")

---

in different paygrades, Gunaldo could argue that LSU placed her in a lower paygrade based on her sex.

[105] The defendants' reliance on *Parr v. Nicholls State Univ.*, No. 09-3576, 2011 WL 838903, at *4 (E.D. La. Mar. 3, 2011) (Engelhardt, J.), *aff'd sub nom. Parr v. Hulbert*, 518 F. App'x 275 (5th Cir. 2013) is misplaced, as the court granted judgment in favor of the defendant with respect to Title VII and EPA claims at the summary judgment stage. *See* R. Doc. No. 28, at 2. The *Parr* Court had the benefit of reviewing the evidence produced in discovery to analyze whether the comparators were truly similarly situated employees. *See* 2011 WL 838903, at *4–*8.

[106] *Muslow* involved an equal protection discrimination claim brought pursuant to 42 U.S.C. § 1983, rather than a Title VII pay discrimination claim. 2020 WL 1864876, at *22. However, as *Muslow* noted, a prima facie case of employment discrimination under either Title VII or § 1983 requires showing, *inter alia*, that the employee was treated less favorably than other similarly-situated employees outside the protected group. *Id.* (citing *Caldwell v. Lozano*, 689 F. App'x 315, 321 (5th Cir. 2017) (citation omitted)).

(citing *Cicalese*, 924 F.3d at 767); *Johnson v. Berry Plastics Corp.*, No. 15-1078, 2015 WL 5568067, at *3 (W.D. La. Aug. 28, 2015), *report and recommendation adopted*, 2015 WL 5599001 (W.D. La. Sept. 22, 2015) (denying the defendant's motion to dismiss plaintiff's Title VII pay discrimination claim, because the similarities between plaintiff and the comparator "remain an issue for discovery" and "[f]or now, it suffices that plaintiff's allegations provide defendant with fair notice of the claim against it").

The Court will not attempt to scrutinize whether Gunaldo's male counterparts are in actuality similarly situated at this juncture. *See Cicalese*, 924 F.3d at 768. LSU's arguments that the male comparators are not sufficiently similar to Gunaldo to support a prima facie case of pay disparity under Title VII and that non-discriminatory justifications exist for the disparity may be properly considered at the summary judgment stage. The Court must, therefore, deny the defendants' motion with respect to Gunaldo's Title VII claim.

## IV.   Equal Pay Act

The amended complaint also alleges that the defendants discriminated against Gunaldo in violation of the EPA by paying, or directing that Gunaldo be paid, less than similarly-situated male employees performing equal work under similar working conditions requiring equal skill, effort, and responsibility.[107]   Gunaldo further alleges that the difference in pay between her and similarly-situated male

---

[107] R. Doc. No. 15, at 15 ¶¶ 107–08.

employees was, and is, not due to any seniority system, merit system, system of earnings by quantity or quality of production, or any other factor other than sex.[108]

The defendants contend that the amended complaint fails to state a claim for relief under the EPA for the same reasons LSU previously asserted with respect to Gunaldo's Title VII claim.[109] The defendants also argue that the EPA claim must be dismissed with respect to the individual defendants, Hollier, Moerschbaecher, and Martin, because they are not "employers" for purposes of the EPA.[110]

The Court will first address whether Gunaldo has stated a claim under the EPA and, second, whether an EPA claim may be maintained against the individual defendants.

## A.

The EPA prohibits discrimination "between employees on the basis of sex by paying wages to employees in such establishment at a rate less than the rate at which [the employer] pays wages to employees of the opposite sex in such establishment for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions[.]" 29 U.S.C. § 206(d)(1). To establish a prima facie case under the EPA, a plaintiff must show that "(1) her employer is subject to the Act; (2) she performed work in a position requiring equal skill, effort, and responsibility under similar working conditions; and (3) she was paid less than an employee of the opposite sex providing

---

[108] *Id.* at 15 ¶ 109.
[109] R. Doc. No. 21-2, at 8–11.
[110] *Id.* at 11–14.

the basis of comparison."[111] *Fields v. Stephen F. Austin State Univ.*, 611 F. App'x 830, 831–32 (5th Cir. 2015) (internal quotation marks and citation omitted). "To establish 'equal work,' the plaintiff need only prove that the 'skill, effort and responsibility' required in the performance of the jobs is 'substantially equal.'" *Jones*, 793 F.2d at 723.

The defendants do not contest that LSU is an employer subject to the EPA or that Gunaldo was paid less than the male comparators. The only element at issue is whether Gunaldo sufficiently pled in her complaint that she performed work in a position requiring skill, effort, and responsibility substantially equal to and under similar working conditions as the men LSU paid more.

The Court finds that Gunaldo has sufficiently pled a claim under the EPA for essentially the same reasons stated with respect to the Title VII claim.  As the defendants recognize, "[g]enerally, a Title VII wage discrimination claim parallels that of an EPA violation."[112]  *Montgomery v. Clayton Homes Inc.*, 65 F. App'x 508 (5th Cir. 2003); *see Parr*, 2011 WL 838903, at *8 (granting judgment in favor of the

---

[111] If the plaintiff establishes her prima facie case, the burden of proof shifts to the employer to show that the differential is justified under one of the four exceptions set forth in the EPA: (1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) any factor other than sex. *Siler-Kohdr v. Univ. of Tex. Health Sci. Ctr. San Antonio*, 261 F.3d 542, 546 (5th Cir. 2001); 29 U.S.C. § 206(d)(1). These exceptions are affirmative defenses as to which the employer has the burden of both production and persuasion. *Jones v. Flagship Int'l*, 793 F.2d 714, 722 (5th Cir. 1986). If the employer offers a defense, the plaintiff must then show that the purported reason is a pretext for discrimination. *Browning v. Southwest Research Inst.*, 288 F. App'x 170, 174 (5th Cir. 2008).
[112] R. Doc. No. 21-2, at 9.

defendant on plaintiff's Title VII claim "for essentially the same reasons stated with respect to [p]laintiff's EPA claim").  Gunaldo has alleged sufficient facts to "nudge[] [her] claim[] across the line from conceivable to plausible[.]" *Twombly*, 550 U.S. at 570; *cf. Espinoza v. San Benito Consol. Indep. Sch. Dist.*, 753 F. App'x 216, 220 (5th Cir. 2018), *cert. denied,* 139 S. Ct. 2697 (2019) (affirming the district court's dismissal of three male plaintiffs' EPA claim when the complaint alleged only that the comparator received a pay raise "even though she had less experience than [plaintiffs]"); *Boudreaux v. Stranco Field Servs., LLC*, No. 18-5569, 2019 WL 2142045, at *7 (E.D. La. May 16, 2019) (Ashe, J.) (dismissing plaintiff's EPA claim because she alleged "nothing about the skill, effort, or responsibility required by the performance of either [comparator's] position," made "bare mention of that required by her own," and failed to state what position either of the comparators held).

### B.

The defendants next argue that Gunaldo's EPA claims must be dismissed against the individual defendants because they are not "employers" under the EPA.

### i.

The defendants contend that Martin, as the Director of HR, has no authority or control over the terms and conditions of Gunaldo's employment or her compensation because, as alleged in the amended complaint, Hollier is responsible for setting salaries for employees within the Chancellor's office and Moerschbaecher was Gunaldo's direct supervisor.[113] While the defendants concede that Hollier and

---

[113] R. Doc. No. 21-2, at 13.

Moerschbaecher may have some control over the terms and conditions of Gunaldo's employment, they argue that these individuals cannot be considered employers because they did not act in their individual capacities when hiring Gunaldo or providing her with a paycheck and withholding taxes and social security.[114] Furthermore, the defendants point out that Hollier, Moerschbaecher, and Martin possess no "employer power" and cannot develop an employer-employee relationship with Gunaldo in their individual capacities.[115]

In response, Gunaldo argues that each of the three individual defendants satisfy the economic reality test, which is a test used by the Fifth Circuit to determine whether an individual is an employer for purposes of the EPA.[116] Gunaldo also highlights that the cases cited by the defendants predate the Fifth Circuit's adoption of the economic reality test, which is a broader standard than that previously utilized to determine whether an individual is an employer.[117]

Gunaldo argues that Moerschbaecher, the Vice Chancellor of Academic Affairs, is her employer for purposes of the EPA because he directly supervises her, oversees the operations of Academic Affairs, Student Affairs, and Research, and is responsible for hiring and firing employees, controlling employee works schedules and conditions of employment, and maintaining employee records.[118] Gunaldo further alleges that Moerschbaecher is responsible for compliance with Louisiana and federal laws, LSU

---

[114] *Id*. at 13–14.
[115] *Id*. at 14.
[116] R. Doc. No. 24, at 13.
[117] *Id*.
[118] *Id*. at 14–15.

System Bylaws and Regulations, Chancellor's Memoranda, regional accreditation standards, and publishing the Faculty Handbook.[119]

Gunaldo argues that Hollier, as Chancellor, is responsible for setting her salary, which weighs in favor of finding that he is an employer under the EPA.[120] Gunaldo contends that the fact that Hollier directly supervises Moerschbaecher, the individual responsible for hiring and firing employees, controlling employee work schedules and conditions of employment, and maintaining employee records, further supports this finding.[121]

Finally, Gunaldo argues that Martin, as Director of HR, has the power to carry out the hiring and firing of employees and is responsible for providing quality support, services, and solutions to LSUHNO staff, faculty, and students.[122]  Gunaldo contends that these allegations create an inference that Martin has power over employees' conditions of employment and maintains employee records.[123]  Gunaldo also asserts that Moerschbaecher told her that HR made decisions regarding salary raises, which leads to the reasonable inference that Martin, in her individual capacity, controlled Gunaldo's salary.[124]

In reply, the defendants argue that Gunaldo relies on several allegations that are not pleaded in her amended complaint and that individuals must satisfy more

---

[119] *Id.* at 15.
[120] *Id.* at 14.
[121] *Id.* at 14–15.
[122] *Id.* at 15.
[123] *Id.*
[124] *Id.*

than one element of the economic reality test to be considered an employer for purposes of the EPA.[125]

*ii.*

The EPA, as part of the Fair Labor Standards Act (the "FLSA"), 29 U.S.C. §§ 201 *et seq.*, uses the same definition of "employer" as defined in the FLSA. 29 C.F.R. § 1620.8. Under the FLSA, an "employer" is "any person acting directly or indirectly in the interest of an employer in relation to an employee and includes a public agency[.]" 29 U.S.C. § 203(d).  To determine whether an individual is an employer for purposes of the FLSA or EPA, the Fifth Circuit utilizes the "economic reality test." *Martin v. Spring Break '83 Productions, LLC,* 688 F.3d 247, 251 (5th Cir. 2012). Under the test, "the court considers whether the alleged employer: (1) possessed the power to hire and fire employees; (2) supervised or controlled employee work schedules or conditions of employment; (3) determined the rate or method of payment; and (4) maintained employee records."[126]  *Id.*

A plaintiff need not establish every element to hold an individual liable as an employer under the EPA. *Orozco v. Plackis*, 757 F.3d 445, 448 (5th Cir. 2014). "While the absence of one factor is not necessarily dispositive, . . . the absence of all factors is fatal." *Oncale v. CASA of Terrebonne Par., Inc.*, No. 19-14760, 2020 WL 3469838,

---

[125] R. Doc. No. 28, at 5–7.

[126] As Gunaldo points out, the cases relied upon by the defendants, *Geller v. Univ. of Mississippi*, No. 00-52, 2001 WL 1079006, at *2 (N.D. Miss. July 9, 2001) and *Schuth v. Louisiana State Univ. Med. Ctr.*, No. 87-4191, 1989 WL 65566, at *2 (E.D. La. June 15, 1989) (Schwartz, J.), did not apply the economic reality test. *See* R. Doc. No. 21-2, at 11–12; R. Doc. No. 24, at 13. As the economic reality test is the proper standard, the Court does not accept the arguments based on *Geller* and *Schuth*.

28

at *13 (E.D. La. June 25, 2020) (Africk, J.) (internal quotation marks and citation omitted).  "The dominant theme in the case law is that those who have operating control over employees within companies may be individually liable for FLSA violations committed by the companies." *Orozco*, 757 F.3d at 448.  Moreover, "[t]he remedial purposes of the FLSA require the courts to define 'employer' more broadly than the term would be interpreted in traditional common law applications." *Id.* (citation omitted).

"In cases where there may be more than one employer, [the] court must apply the economic realities test to each individual or entity alleged to be an employer and each must satisfy the four part test." *Gray v. Powers*, 673 F.3d 352, 355 (5th Cir. 2012) (internal quotation marks and citation omitted).  The Court will apply the economic reality test to each of the three individual defendants.

### *Moerschbaecher*

According to the amended complaint, Moerschbaecher is the Vice Chancellor of Academic Affairs at LSUHNO, Dean of Graduate School Studies, and a Professor of Pharmacology.[127]  As the chief academic officer at LSUHNO, he reports directly to the Chancellor, Hollier.[128]  Moerschbaecher's responsibilities as Vice Chancellor include overseeing the operations of three major areas and directly supervising Gunaldo.[129]  Moerschbaecher also oversees program and curriculum changes, publishes the Faculty Handbook, and insures that LSUHNO is in compliance with

---

[127] R. Doc. No. 15, at 3 ¶ 11.
[128] *Id.* at 3 ¶ 13.
[129] *Id.* at 3 ¶ 12.

pertinent Louisiana and federal laws, LSU System Bylaws and Regulations, Chancellor's memoranda, and regional accreditation standards.[130]  As the defendants point out, the amended complaint does not explicitly allege that Moerschbaecher is responsible for hiring and firing employees, controlling employee work schedules and conditions of employment, or maintaining employee records, as Gunaldo asserts in her response in opposition.[131]

Applying the well-pleaded factual allegations of the amended complaint to the economic reality test, the Court cannot reasonably infer that Moerschbaecher is an employer for purposes of the EPA.  While the defendants are correct that the amended complaint does not explicitly allege that Moerschbaecher controls Gunaldo's work schedule and conditions of her employment, the Court can reasonably infer that, as her supervisor, Moerschbaecher has at least some control over these aspects of Gunaldo's employment.[132]  However, the Court will not find that Moerschbaecher is an individual employer under the EPA based on the single allegation that he directly

---

[130] *Id*. at 3 ¶ 14.

[131] *See* R. Doc. No. 24, at 15; R. Doc. No. 28, at 6.

[132] Gunaldo relies on *Herster v. Bd. of Sup'rs of Louisiana State Univ.*, No. 13-139, 2013 WL 2422893, at *7–*9 (M.D. La. June 3, 2013) in support of her claim that the individual defendants can be held liable under the EPA. R. Doc. No. 24, at 13–14. That case is clearly distinguishable with respect to Moerschbaecher.  *Herster* determined that the complaint plausibly alleged that the Director of the School of Art, the plaintiff's supervisor, could be held liable as an employer under the EPA. *Id*. The complaint alleged that the plaintiff's supervisor negotiated her contract, which suggested he had hiring powers; supervised and controlled her schedule and conditions of her employment, including assigning her to her position, giving her a "windowless closet as an office," and excluding her from meetings; indicated that he set the plaintiff's title and pay; and had at least partial responsibility to compile the plaintiff's records that were distributed to the faculty for the vote on her reappointment. *Id*. at *8.

supervised Gunaldo, which satisfies only the second prong of the economic reality test. *See Martin,* 688 F.3d at 253 (sustaining summary judgment in favor of defendant where plaintiff only adduced evidence to support one economic realities factor); *Papagolos v. Lafayette Cty. Sch. Dist.*, 972 F. Supp. 2d 912, 921 (N.D. Miss. 2013), *amended on reconsideration on other grounds* (Nov. 13, 2013). Accordingly, Gunaldo's EPA claim asserted against Moerschbaecher must be dismissed.

*Hollier*

Turning next to Hollier, the amended complaint alleges that his duties as Chancellor include setting salaries for employees within the Chancellor's office, including that of Gunaldo, and supervising Moerschbaecher.[133]  Gunaldo does not direct the Court's attention to any other allegations that support her assertion that Hollier is an employer under the EPA.

As just discussed, Moerschbaecher is not an employer for purposes of the EPA, and the fact that Hollier supervises Moerschbaecher is irrelevant to the Court's determination of whether Hollier is an employer.  Hollier satisfies the third element of the economic reality test, as he is responsible for setting Gunaldo's salary. However, the amended complaint does not allege that he possessed the power to hire and fire employees, supervised or controlled employee work schedules or conditions of employment, or maintained employee records.  As with Moerschbaecher, the Court is unwilling to determine that Hollier may be held individually liable under the EPA

---

[133] R. Doc. No. 15, at 2 ¶¶ 7–8, 3 ¶ 13.

based on one factor.[134] Accordingly, Gunaldo's EPA claim asserted against Hollier must be dismissed.

*Martin*

The amended complaint alleges that Martin was the Director of HR at LSUHNO and responsible for providing quality support, services, and solutions to the LSUHNO staff, faculty, and students.[135]  Gunaldo met with Martin on March 28, 2018, after she was informed by Moerschbaecher that HR determined the rate at which her salary increased.[136]  Martin informed Gunaldo at this meeting of the study that was conducted regarding salary ranges at the institution.[137]  Martin, along with two other HR representatives, met with Gunaldo again on February 27, 2019 and provided her with, among other things, information regarding her salary and salaries of comparable positions at other institutions.[138]

The Court finds that there are sufficient allegations, at this stage, to support an inference that Martin was an employer. With respect to the first and second prongs of the economic reality test, the amended complaint does not allege that Martin had

---

[134] Again, the lack of factual allegations in Gunaldo's amended complaint distinguish this case from *Herster*. The complaint in *Herster* plausibly alleged that the Dean of the College of Art and Design, to whom the plaintiff's supervisor directly reported, was an employer for purposes of the EPA. 2013 WL 2422893, at *7–*8.  According to the complaint, the Dean had the power to hire employees, divest the plaintiff of access to university benefits, possessed final decision-making authority on whether to promote the plaintiff, set employee workloads and compensation, and maintained the plaintiff's records, specifically, the minutes of the faculty meeting and the memorandum of reasons explaining the decision not to reappoint her. *Id.*
[135] R. Doc. No. 15, at 3 ¶¶ 17–18.
[136] *Id*. at 7 ¶¶ 47–48.
[137] *Id*. at 7 ¶ 48.
[138] *Id*. at 11 ¶¶ 73–74.

hiring or firing powers or that she supervised Gunaldo's schedule or conditions of employment.

However, the amended complaint does plausibly allege that Martin had some control over Gunaldo's salary raise, satisfying the third prong, and that Martin maintained Gunaldo's employment records, satisfying the fourth prong. The amended complaint alleges that Moerschbaecher told Gunaldo that HR was responsible for employee raises.[139] As the Director of HR, the Court can reasonably infer that Martin had at least some control over Gunaldo's compensation and played a role in raising Gunaldo's salary by two percent. *Cf. Herster*, 2013 WL 2422893, at *9 (finding that because the human resources department "appeared to have at least some control over [plaintiff's] compensation," the complaint plausibly alleged that the individual defendants who worked in the human resources department "had some control over [plaintiff's] compensation, satisfying the third prong"). With respect to the fourth prong, the amended complaint plausibly alleges that Martin was at least partially responsible for compiling the information provided to Gunaldo at the February 2019 meeting regarding her position and salary. This fact raises the inference that Martin maintained Gunaldo's employee records.

---

[139] The defendants seem to suggest that the Court should not consider the allegation that HR made decisions regarding salary raises because the amended complaint also alleges that Hollier set Gunaldo's salary. *See* R. Doc. No. 28, at 6–7. The Court does not view these facts as contradictory. It is entirely plausible that Hollier set Gunaldo's compensation within the N37 paygrade, and HR subsequently determined the percentage of her salary raise.

Accordingly, the defendants' motion with respect to the EPA claim asserted against Martin must be denied.

* * *

In sum, the Court must deny the defendants' motion with respect to the EPA claim asserted against LSU and Martin, and it must grant the motion with respect to the EPA claim asserted against Moerschbaecher and Hollier.

## V.

Accordingly,

**IT IS ORDERED** that the defendants' motion to dismiss is **GRANTED IN PART** and **DENIED IN PART**.

**IT IS FURTHER ORDERED** that the defendants' motion with respect to the Title VII claim asserted against LSU is **DENIED.**

**IT IS FURTHER ORDERED** that the defendants' motion with respect to the EPA claim asserted against LSU and Martin is **DENIED**.

**IT IS FURTHER ORDERED** that the defendants' motion with respect to the EPA claim asserted against Hollier and Moerschbaecher is **GRANTED**. The EPA claim asserted against Hollier and Moerschbaecher is **DISMISSED**.

New Orleans, Louisiana, August 10, 2020.

_____
**LANCE M. AFRICK**
**UNITED STATES DISTRICT JUDGE**